UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

-----------------------------------------------------------------X
JOHN DOE,

Civil Action No:

                Plaintiff,

**COMPLAINT**

      -against-

**Jury Trial Demanded**

UNIVERSITY OF TEXAS HEALTH SCIENCE
CENTER AT HOUSTON, UNIVERSITY
OF TEXAS BOARD OF REGENTS,
MARGARET MCNEESE, in her individual
and official capacity, DEANA MOYLAN,
in her individual and official capacity,
SHEELA LAHOTI, in her individual and
official capacity, and DANA MCDOWELLE,
in her individual and official capacity,

                Defendants.
-----------------------------------------------------------------X

Plaintiff John Doe ("Plaintiff" or "Doe")[1], by his attorneys, Nesenoff and Miltenberg, LLP,

whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York 10001, and

Jordan, Lynch & Cancienne PLLC, whose offices are located at 1980 Post Oak Blvd, Suite 2300,

Houston, Texas 77056 alleges upon knowledge with respect to himself, and upon knowledge,

information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1.     This case arises out of Defendants' biased, wrongful actions taken in connection

with a Title IX investigation against Plaintiff, a talented and promising medical student at the

---



[1] Plaintiff is filing herewith a motion to proceed under pseudonym.

University of Texas Health Science Center McGovern Medical School ("UT Health" or the "University"), which resulted in a six-month "interim" suspension, erroneous finding of responsibility, and notation of the suspension and finding on Plaintiff's Medical Student Performance Evaluation (the "MSPE")[2]. After years of hard work, the notation on Plaintiff's MSPE will preclude him from matching with a competitive residency program of his choice.

2.      Plaintiff and fellow UT Health student Jane Roe[3] ("Roe"), had been in an ongoing, tumultuous relationship since 2018, during which the parties constantly fought and made up.

3.      On the night of February 14, 2020, while Roe and Plaintiff were broken up, Plaintiff, in an intoxicated, depressed and emotional state due to Roe's constant belittlement of Plaintiff, threatened self-harm on a phone call to Roe. Plaintiff sat on his couch with an *unloaded* pistol, when Roe entered Plaintiff's apartment without his consent, using a key that she had refused to give back to Plaintiff despite his multiple requests to do so in the weeks prior.

4.      Roe saw the pistol, swiftly left, called the cops, and had Plaintiff arrested for domestic violence. Roe subsequently reported Plaintiff to the University, initiating a disciplinary investigation process.

5.      Though Roe told shifting, baseless stories throughout the University's disciplinary process, and despite the fact that this was clearly a mental health event, rather than an instance of misconduct, Doe was nonetheless found responsible for dating violence in violation of the University's Sexual Misconduct Policy.

6.      Worse, the University attempted to get Plaintiff to sign an agreement waiving his right to a hearing for the matter.  When Plaintiff refused to sign the waiver and expressly requested

---

[2] The MSPE is an evaluation letter which provides residency directors a summary of the student's experience and performance.
[3] Jane Roe is a pseudonym.

a hearing, the University declined to do so in violation of its own policies and his procedural due process rights.

7.      When the finding was passed onto the Dean to determine what sanction to impose, the Dean ordered a psychiatric evaluation be performed on Doe, to determine if he was fit to be a doctor. The University had doctors evaluate Plaintiff for *months* in an attempt to find Plaintiff unfit to return to school.

8.      Ultimately, after an investigation and adjudication process that took nearly *six months*, throughout which Plaintiff was interim suspended, the University allowed Plaintiff to return to school at the last possible minute to complete his third-year rotations, subject to numerous mental health related conditions. However, while Plaintiff was able to complete his coursework, the short amount of time he had to do so precluded him from participating in the 2021 residency match due to inadequate time to participate in fourth-year rotations and to obtain necessary recommendations from faculty.

9.      Plaintiff asked to defer his graduation by one year in order to obtain the needed experience and to participate in away rotations, which would have given him considerably more experience and career opportunities. Away rotations allow students to gain hands on experience with other institutions to see if they would be interested in training there, and also serve as month long job interviews as physicians observe a trainee's clinical ability and compatibility with a program. University administration refused, due to the fact that they would not allow Plaintiff to be in the same graduating class as Roe. As such, Plaintiff was denied educational opportunities that were available to Roe.

10.      Notably, while the University relied largely on documents from the criminal proceedings against Plaintiff, even after Plaintiff received an expunction, the University still

proceeded to hold Plaintiff responsible. Despite the fact that this was clearly a mental health event, and not dating violence, as evidenced by the psychiatric evaluations and continuous counseling that the school required Plaintiff to undergo, the University continued to classify the event as dating violence in order to make a "professionalism" notation on Plaintiff's MSPE and hinder his future career opportunities. Mental health issues, on the other hand, are not noted on a student's MSPE.

11.     As a result of the erroneous finding of responsibility, Defendants marked Plaintiff's MSPE with the disciplinary matter, thus hampering his residency opportunities and career outcomes for the rest of his life.

12.     By employing gender-based, pre-determined presumptions of Plaintiff's guilt from the outset, by improperly treating a mental health event as an instance of dating violence, and by imposing an unreasonable sanction upon Plaintiff, Defendants displayed anti-male discriminatory bias in violation of Title IX of the Education Amendments of 1972.

13.     By violating the University's own policies and depriving Plaintiff of a hearing and meaningful opportunity to be heard, Defendants violated Plaintiff's fundamental rights to due process.

14.     By violating the University's own policies and depriving Plaintiff of a fair and impartial disciplinary process, Defendants breached express and implied agreements with Plaintiff and acted in bad faith in failing to fulfill its promises to him as an enrolled student paying tuition at UT Health.

15.     As a result of Defendants' discriminatory and unlawful conduct, Plaintiff has sustained damages, including but not limited to past and future economic losses, reputational harm, and diminished/lost future educational and career prospects.

16.     Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief.

## THE PARTIES

17.     Plaintiff John Doe is a natural person and was a resident of the state of Texas at all relevant times herein.

18.     At all times relevant to this Complaint, Defendant UT Health was and is a public institution of higher education with an address of 7000 Fannin St #1200, Houston, TX 77030.

19.     At all times relevant to this Complaint, UT Health received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (hereinafter "Title IX").

20.     According to published UT Health financial statements for the fiscal year ending August 31, 2019, Defendant UT Health received over $50,000,000 in federal student loans. *See* UTHSCH Report Book 2019 V2.pdf

21.     At all times relevant to this Complaint, the University of Texas Board of Regents was and is comprised of nine (9) members who are appointed by the Governor and confirmed by the Senate, and is the governing body for The University of Texas System.

22.     Defendant Margaret McNeese ("McNeese") is a natural person and, upon information and belief, a resident of the State of Texas. McNeese was the Title IX Coordinator and Vice Dean for Admissions and Student Affairs at UT Health at all relevant times herein.

23.     Defendant Deana Moylan ("Moylan") is a natural person and, upon information and belief, a resident of the State of Texas. Moylan was the Deputy Title IX Coordinator and Associate Vice President of Diversity and Equal Opportunity at UT Health at all relevant times herein.

24.     Defendant Sheela Lahoti ("Lahoti") is a natural person and, upon information and belief, a resident of the State of Texas. Lahoti was the Assistant Dean of Admissions and Student

Affairs at UT Health at all relevant times herein.

25.     Defendant Dana McDowelle ("McDowelle") is a natural person and, upon information and belief, a resident of the State of Texas. McDowelle was the Assistant Dean, Office of Admissions and Student Affairs at UT Health McGovern Medical School at all relevant times herein.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the laws of the United States, specifically, under Title IX of the Education Amendments of 1972. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

27.     This Court has personal jurisdiction over Defendant UT Health on the grounds that it is conducting business and is principally located in Houston, Texas.

28.     This Court has personal jurisdiction over Defendant University of Texas Board of Regents on the grounds that it is the governing body of UT Health.

29.     This Court has personal jurisdiction over Defendant McNeese on the ground that she was employed by UT Health at all relevant times herein.

30.     This Court has personal jurisdiction over Defendant Moylan on the ground that she was employed by UT Health at all relevant times herein.

31.     This Court has personal jurisdiction over Defendant Lahoti on the ground that she was employed by UT Health at all relevant times herein.

32.     This Court has personal jurisdiction over Defendant McDowelle on the ground that she was employed by UT Health at all relevant times herein.

33.     Venue is proper in this case pursuant to 28 U.S.C § 1391(b)(2) because the events or omissions which give rise to Plaintiff's claims took place in Houston, Texas which is located in the Southern District of Texas.

## I.   FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.  History of the Dear Colleague Letter

34.     On April 4, 2011, the Office for Civil Rights ("OCR") of the United States Department of Education ("DOE") issued a guidance document on sexual violence, the "Dear Colleague Letter" ("DCL"), U.S. Department of Education, *Dear Colleague* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf   [hereinafter   *Dear Colleague Letter* or *DCL*], interpreting Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and its regulations, 34 C.F.R. Part 106 (2018). Title IX's regulations require colleges and universities to have prompt and equitable grievance procedures to resolve complaints of sex discrimination, including sexual harassment.

35.     While directing schools "to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects," *Dear Colleague Letter*, *supra*, at 4, the DCL de-emphasized fair process by, among other things, being silent on a presumption of innocence, directing schools to "minimize the burden on the complainant," *id.* at 15–16, limiting cross-examination, *id.* at 12, requiring use of the "preponderance of the evidence" standard rather than the higher "clear and convincing evidence" standard, which some colleges were using, *id.* at 11, and prohibiting certain forms of alternative dispute resolution, *id.* at 8.

36.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

37.     The DCL, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.

38.     In a related guidance document published on April 29, 2014 by the U.S. Department of Education, *Questions and Answers on Title IX and Sexual Violence* (Apr. 29, 2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf (hereinafter "2014 Q&A"), OCR advised schools that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant," *id.* at 31, and persons implementing schools' grievance procedures should be trained on "the effects of trauma, including neurobiological change," *id.* at 40.

39.     Like the DCL, the 2014 Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."

40.     In the same month that the OCR issued its 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), available at https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf. The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

41.     In June 2014, the DOE's Assistant Secretary for Civil Rights, Catherine Lhamon, testified before the United States Senate that if OCR could not secure voluntary compliance with

its Title IX guidance from a college or university, the agency could initiate administrative action to terminate federal funds or refer the case to the Department of Justice. *See* Testimony of Catherine E. Lhamon, Assistant Secretary Office For Civil Rights, U.S. Department Of Education (June 26, 2014), https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

42.     Over the past decade, universities across the country, including the University of Texas, have adopted "procedural and substantive policies intended to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572-73 (D. Mass. 2016).

43.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted *over five hundred* investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited March 25, 2021).

44.     The DCL and OCR put considerable pressure on universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." *Presumed Guilty: College men accused of rape say the scales are tipped against them,* Chronicle of Higher Education, September 1, 2014.  In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see

the male student as the one physically able to initiate sex, and therefore responsible for gaining the

woman's consent."

45.     Indeed, a 2014 white paper issued by the Association of Title IX Administrators

(ATIXA), titled, *Equity is such a Lonely Word*, functionally directed colleges to tilt their

investigations in favor of women:

> [C]ampuses for so many years considered only (or primarily) the
> rights and situation of the accused. Thus, equity ends up feeling like
> a shift to victim's rights, even though it is not. Ultimately, the
> pendulum should shift to the middle, rather than to either party, but
> ***because victims have been historically been accorded 3/5 of the
> rights of an accused individual (or less), and victims are typically
> women, equity may require institutions to recalibrate the
> pendulum*** to right the historical imbalance.

> (emphasis added)

46.     On September 22, 2017, OCR rescinded its 2011 DCL and its 2014 Q&A and noted

that the agency had been widely criticized for putting "improper pressure upon universities to

adopt procedures that do not afford fundamental fairness." U.S. Department of Education, *Dear

Colleague* (Sept. 22, 2017),  https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-

201709.pdf (quoting Members of the Penn Law School Faculty, *Sexual Assault Complaints:

Protecting Complainants and the Accused Students at Universities*, Wall St. J. (Feb. 18, 2015),

http://online.wsj.com/public/resources/documents/2015_0218_upenn.pdf).

47.     As former Secretary of Education, Betsy DeVos, noted, the rescission of the DCL

was largely motivated by "[t]he truth . . . that the system established by the prior administration

has failed too many students," specifically because "[t]he notion that a school must diminish due

process rights to better serve the 'victim' only creates more victims."  Press Release, Secretary

DeVos Prepared Remarks on Title IX Enforcement (Sept. 7, 2017), *available at*

https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

48.     At the same time, the DOE issued proposed new Title IX regulations, a large portion of which were intended to restore the promise of due process that the DOE recognized had been diminished by the 2011 DCL.

49.     On May 6, 2020, the Department of Education released its final regulations on Title IX, which took effect on August 14, 2020.[4] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106). The regulations make clear, *inter alia*, that schools can be found to discriminate on the basis of sex by treating either the complainant or the respondent unfairly; that parties must be provided a live hearing with cross-examination and access to the complaint, the evidence from the investigation, and a written decision carefully addressing the evidence; that respondents must be presumed not responsible; that all relevant evidence must be evaluated objectively; that investigators and decisionmakers must receive non-biased training, may not rely on sex stereotypes, and must be impartial; and must explain delays for good cause in the timeframe of the process in writing.

50.     On information and belief, UT Health implements its sexual misconduct policies in a manner intended to protect women, and endeavors to find male accused students responsible and punish them harshly, in order to avoid any further institutional harm resulting from bad media attention and/or a possible loss of federal funds pursuant to an OCR investigation.

51.     On information and belief, UT Health's institutional self-interest in avoiding further bad press and student outrage resulted in an inherent gender bias which directly affected Plaintiff's case, leading to an erroneous finding, and an unwarranted suspension.

---

[4] The DOE published the final regulations in the *Federal Register* on May 19, 2020.

### B.  Plaintiff applies to, and enrolls at UT Health

52.     Plaintiff grew up in Houston as the son of a foreign-born physician who came to the United States for medical training, and as such, has held longtime aspirations to become a physician to continue his family legacy.

53.     Accordingly, Plaintiff has always been very focused on his studies in order to become a physician, earning his undergraduate degree from UCLA where he graduated Cum Laude with a GPA of 3.71.

54.     Plaintiff enrolled at UT Health in the Fall of 2017 to begin his medical education and pursue a career in orthopedic surgery.

55.     Throughout his time at UT Health, Plaintiff was an exceptional student, having honored in all but one rotation during medical school and having been lauded for his professionalism, dedication to patients, and clinical aptitude beyond his level of education by evaluators throughout his clinical experiences. Plaintiff has also scored in the 95th percentile on both the USMLE STEP 1 and 2 board exams, which are pivotal in the residency match process, making him a competitive applicant for orthopedics when combined with his strong clinical performance.

56.     Plaintiff met Jane Roe on September 30, 2018, and the two began dating exclusively on October 27, 2018. Plaintiff enjoyed his relationship with Roe because her family was accepting of Plaintiff and welcomed him in.

57.     However, as the relationship developed, Roe became increasingly possessive and controlling, often attempting to limit his involvement with his friends and their significant others, as well as his family.

58.     In the midst of Roe's controlling and manipulative tactics, rather than confronting her, Plaintiff consistently attempted to please and accommodate Roe. Often times, Plaintiff was the one that ended up apologizing in order to keep the peace.

59.     As the relationship continued and Plaintiff and Roe began to discuss their futures, Roe became so demanding that Plaintiff had a difficult time prioritizing his studies. Plaintiff, who had always been extremely focused on his studies, was concerned that Roe's behavior could impact his schoolwork, and subsequently his career opportunities. Plaintiff attempted to set boundaries in the relationship, but Roe grew more demanding in response.

### C.  The night of February 14, 2020

60.     On February 14, 2020, Roe and Plaintiff spoke via Snapchat message throughout the day. Roe sent a Snapchat message to Plaintiff around 4:00 p.m. indicating that she bought gifts for Plaintiff for Valentine's Day and wanted to bring them to Plaintiff. While Plaintiff originally planned to make dinner for Roe for Valentine's Day, due to an ongoing argument, Plaintiff called Roe when he got out of clinic, around 5:00 p.m., and told her that he did not think dinner was a good idea, but that Roe could come pick up the gifts that he had for her.

61.     After ending the call, Plaintiff went home, studied, then went to the grocery store to pick up some wine. Plaintiff then returned to his apartment and started drinking wine while he cooked dinner. As Plaintiff finished cooking, he was feeling the effects of the alcohol and became very emotional. He called Roe several times and when she picked up, she told Doe that she was not going to go to Plaintiff's house that night but instead was going to see her sister.

62.     Plaintiff, in an extremely emotional and intoxicated state, called Roe again and threatened his own life. Plaintiff did not ask Roe to come to his apartment and did not expect her to do so. Plaintiff was feeling sad, alone, and was grieving the end of the relationship. Plaintiff

then went to his bedroom, got an unloaded pistol[5], and sat on the couch with it. At the time, he had his television on and ate his meal.

63.     Plaintiff was shocked when Roe entered his apartment without his consent, by using a key that Plaintiff had previously given her. Roe only had the key because she refused to return it after multiple requests from Plaintiff.

64.     When Roe entered Plaintiff's apartment, Plaintiff was sitting on the couch with the *unloaded* pistol beside him. He wanted Roe to leave because he did not want anyone to see him in his emotional state. Plaintiff asked Roe to leave, but she refused. Plaintiff then waved the gun to point to the door and told her to leave, and Roe swiftly left. Plaintiff never had any intention of hurting himself or Roe.

65.     Plaintiff called Roe multiple times afterwards to apologize because he never meant to frighten her as he had no intention of harming anyone.

66.     However, as soon as Roe left Plaintiff's apartment, she called the police and claimed that Plaintiff "produced" a gun after an argument between them. The police arrived within moments, arrested Plaintiff for domestic violence, and subsequently forced Plaintiff to spend two nights in jail.[6] A no-contact order was entered by the police against Plaintiff, forbidding Plaintiff from having any contact with Roe.

67.     Roe then reported Plaintiff to the University, but provided an account inconsistent with what she had told the police. The University separately enforced its own no-contact order between Plaintiff and Roe throughout the investigation.

---

[5] Plaintiff is licensed to carry in the State of Texas.
[6] A criminal matter was subsequently commenced against Plaintiff.

### D. UT Health Conducts a Biased Investigation, Depriving Plaintiff of a Hearing and an Appeal

68.     On February 20, 2020, Plaintiff received an email from Moylan, requesting a meeting with Plaintiff and his advisor, on February 21, 2020. Plaintiff requested a six-day extension for the meeting, which was granted.

69.     Incredibly, that night, despite claiming to be fearful of Plaintiff and requesting a no-contact order, Roe showed up at Plaintiff's family's home, where she knew he was staying, in the middle of the night. When she couldn't get a hold of Plaintiff, Roe called multiple family members of Plaintiff, left two voice messages on Plaintiff's mother's phone, and sat outside of Plaintiff's home for over 45 minutes. Roe's mother called Plaintiff's father expressing that Roe just wanted to talk. Plaintiff's father explained that Plaintiff could not talk to Roe due to a court mandated no-contact order – the very order that Roe requested. Roe remained standing and crying in the street and in her car waiting for Plaintiff to open the door until she eventually decided to drive away.

70.     On February 26, 2020, Plaintiff had his initial interview with Moylan, McNeese, Amy Dixon, Legal Officer at UT Health, and Tiffany Obeng, Senior Equal Opportunity Advisor ("Obeng") (collectively, the "Committee"). Moylan asserted that all parties were bound to confidentiality for the protection of all parties involved. Moylan further stated that Plaintiff was not allowed to contact Roe due to the no-contact order, and that Plaintiff could not set foot on campus unless provided with a formal invitation by the University.

71.     During this meeting, Moylan incredibly and inappropriately asked for Plaintiff's nationality and religion in reference to an alleged comment Plaintiff made to Roe and repeatedly claimed that Plaintiff lived in a "penthouse" in order to paint Plaintiff as spoiled.

72.     During the interview, McNeese pressed Plaintiff on the assertion that Plaintiff was trying to ruin Roe's life and career as well as Plaintiff's use of alcohol and cocaine based upon

15

Roe's false allegations. McNeese demonstrated no interest in obtaining the truth, but rather sought to gather statements to support Roe's claims.

73.     This meeting, which was more similar to an interrogation, included questioning from all four members of the Committee and lasted for over two hours with a mere fifteen-minute intermission in the middle. However, when Plaintiff informed the Committee that Roe appeared at Plaintiff's home on the night of February 20, 2020, the Committee dismissed Plaintiff's complaint and swiftly ended the interview.

74.     Notably, following this interview, McNeese informed Plaintiff that she had "recused" herself to allow Moylan to continue the investigation. Nevertheless, McNeese continued to be involved at every step of the investigation, acting as the sole investigator and executioner in the process.

75.     On February 28, 2020, the Committee sent Plaintiff a document summarizing his interview, and requested a response by March 10, 2020, making any necessary edits to the summary and adding any additional relevant information.

76.     On March 9, 2020, McNeese sent Plaintiff an email notifying him that he was interim suspended pending the outcome of the investigation and requesting that Plaintiff sign a letter waiving his right to a hearing regarding the decision to impose an interim suspension.

77.     On March 10, 2020, Plaintiff submitted his interview summary response to the Title IX Committee. Plaintiff provided the Committee with two drug screenings, two audio files, Plaintiff's final response, a letter Roe had previously written to Plaintiff, a picture of Roe outside of his apartment on February 20, 2020, and a diagram of Plaintiff's apartment that he drew at the February 26, 2020 meeting.

78.     Plaintiff emailed McNeese on March 12, 2020 stating that he was not going to sign the release and requested a hearing on his interim suspension. McNeese responded the next day stating that a hearing would be arranged as soon as possible given the recent developments of the COVID-19 pandemic. However, said hearing *never occurred*.

79.     Notably, the University moved to virtual instruction on March 13, 2020 due to the COVID-19 pandemic. Accordingly, there was no "danger" of Plaintiff being on campus or being in contact with Roe, and thus no justifiable reason for continuing Plaintiff's suspension rather than allowing him to continue with classes remotely.

80.     On March 25, 2020, Plaintiff's advisor sent a letter to the University addressing Moylan's question to Plaintiff at the February 26, 2020 meeting regarding his nationality, explaining that the question was wholly inappropriate and lacked any relevance to the charges. Dixon responded to Plaintiff's advisor's letter on March 26, 2020, merely stating that the question was asked to gain "a full picture" of the context of the allegations.

81.     Also on March 25, 2020, at the recommendation of his advisor, Plaintiff underwent a complete psychiatric assessment with Dr. George Glass, the fifth full time faculty and current clinical associate professor at UT Houston who has practiced Psychiatry for 46 years, helped create the Navy's Alcohol Treatment Program, and also performs independent forensic psychiatric evaluations of physicians for the Texas Medical Board. In Dr. Glass' report, he recommended that UT Health conduct a thorough forensic psychiatric assessment and substance abuse screening of *both* Plaintiff and Roe due to the fact that he believed Roe exhibited features of borderline personality disorder. Notably, despite this information, the University never requested a psychiatric assessment of Roe.

82.    On March 26, 2020, Obeng sent Plaintiff a Zoom meeting invitation to review the investigation summary, which occurred on March 30, 2020. Plaintiff was not provided a hard copy of the investigation summary, and was instead required to view it remotely. The investigation summary did not accurately account for key events and intentionally left out critical points. During the Zoom call, members of the Committee exhibited extremely unprofessional conduct, showing blatant disrespect towards Plaintiff in what was a very important meeting by carelessly clipping their nails throughout the meeting.

83.    On April 6, 2020, Plaintiff submitted his response to the investigation summary. Plaintiff outlined the many false statements that Roe had made to the Committee in order to paint Plaintiff as an oppressive, aggressive, abusive, drug addict. By way of example and not limitation:

a.   Roe claimed that Plaintiff was a cocaine user and "left her for crack/cocaine" at a party in January 2020. She made this same assertion to Plaintiff's mother via text message while trying to state he was hanging out with a bad crowd. This was factually disproven by a negative nailbed mass spectrometry test for cocaine, which confirmed no cocaine exposure for a 6–8 month period prior to test date. Allegations regarding drug use alone are severe and a valid reason for dismissal and denial/revocation of one's medical license. This fabrication was intentionally made to damage Plaintiff's reputation and future career prospects.

b.   Roe claimed that she and Plaintiff broke up two to three weeks prior to February 14, 2020 after an argument at a party, and that Plaintiff offered to make her dinner to reconcile. However, Plaintiff's text messages demonstrated that Roe initiated reconciliation the day after the party. Roe even left roses at Plaintiff's door a few days later.

c.   Roe claimed that Plaintiff told her that he wanted to ruin her life and her performance on the Step 1 exam. However, this was blatantly false. Plaintiff submitted numerous text messages between Plaintiff and Roe about the exam which not only showed Plaintiff being extremely caring and supportive, but also guiding Roe through the preparation process. Roe even stated that she "had a great coach".

d.   Roe claimed that she tried contacting Plaintiff the morning of February 14, 2020 to talk to Plaintiff about gifts she had already purchased for Valentine's Day, but that Plaintiff did not respond to her until the evening. However, this was another fabrication by Roe. Plaintiff submitted documentation that showed a receipt Roe left with the "gifts" she brought to Plaintiff's apartment the evening of February

14, 2020, showing she purchased these "gifts" at 4:42pm that same day. This demonstrates that Roe still intended to see Plaintiff late into the afternoon despite her false statements. In addition, there were a number of messages exchanged between himself and Roe on the morning of February 14, 2020, as well as numerous Snapchat messages throughout the day.

84.     Roe's fabrications about the details of the event demonstrated her tendency to manipulate the story to paint her fallacy. Despite the fact that Plaintiff was able to prove that Roe was lying on numerous points in her story, the Investigators never questioned Roe's credibility. Instead, they took everything Roe said at face value and presumed Plaintiff guilty from the start, as a male accused.

85.     In taking Roe's statements at face value, Moylan and McNeese never recognized that Roe was abusive, nor did they observe that Plaintiff's tendency to internalize conflict led to his depression. Instead of treating this as a mental health event or providing appropriate resources and support to one of their students, they instead continued to severely punish him under the guise of sexual misconduct.

86.     On April 15, 2020, Plaintiff received a Title IX determination letter from Moylan, stating that Plaintiff was found responsible for violating HOOP Policy 59. Notably, the letter relied heavily on statements from Roe and her witnesses, and Plaintiff was never given the opportunity to cross-examine any of the witnesses in order to raise plausible credibility concerns.

87.     Notably, Plaintiff was *not given the opportunity to appeal the decision*. HOOP 186 only provides an appeal for "the decision of the hearing officer." As the University failed to give Plaintiff a hearing *despite the fact that he never agreed to waive his hearing*, the University also precluded Plaintiff from having the ability to appeal the finding of responsibility.

88. Incredibly, on April 24, 2020, Roe "loved" an old text message[7] from Plaintiff. Clearly, Roe was going through her old texts with Plaintiff, and this was yet another attempt to contact Plaintiff and provoke him to violate the court's mandated no-contact order.

89. On April 29, 2020, the Grand Jury for the criminal charges against Plaintiff found that there was no probable cause to indict Plaintiff, and a no bill of prosecution was issued. Significantly, even the Grand Jury determined that this was a mental health event rather than an act of violence.

90. On May 1, 2020, due to the fact that Plaintiff had been suspended for nearly three months, Plaintiff lost his school health insurance. This prevented Plaintiff from seeking affordable psychiatric help during one of the most difficult times of his life. In contrast, Roe, as the "victim" had no lack of support services to seek out.

### E. The University Forces Plaintiff to Undergo a Psychiatric Evaluation

91. On May 5, 2020, Plaintiff's advisor reached out to Dixon regarding the status of the investigation. Dixon stated that the matter was in the hands of the Dean's Office and she anticipated that they would request a forensic psychiatric evaluation. After that, the Dean's Office would state its sanctioning recommendation and a hearing officer would be appointed. Notably, Dixon claimed that she did not provide the Deans with Dr. Glass's psychiatric evaluation because she did not have permission. However, *she never asked*. Dr. Glass's evaluation provided a crucial insight to the dynamics of the relationship between Roe and Plaintiff, however, Dixon chose to withhold it from the University members that would be making the sanctioning determination.

[7] To "love" a message, one must press down on a message for a few seconds until "reactions" are displayed above that message. Then, the person must select the specific reaction. For example, one can select the heart to "love" a message or the thumbs up to "like" a message. This is an action that takes deliberate steps and is not one that a person does by accident.

92.     On May 11, 2020, *nearly one month* after being notified of the Title IX Office's determination, McNeese sent a letter to Plaintiff stating that due to the graveness of the allegations against Plaintiff, more information was needed in order to determine what disciplinary sanction was to be implemented. Accordingly, McNeese stated that Plaintiff would be required to undergo a psychological evaluation to be performed by Dr. Michael Arambula and that Plaintiff had to contact Dr. Arambula by May 15, 2020.

93.     Notably, on information and belief, Dr. Arambula had ties to Roe's family. Of all psychiatrists available in the area, Dr. Arambula's home and practice were intertwined with the community in which Roe's family lived. Additionally, Dr. Arambula's son attended and played baseball for the same high school which Roe and her sister attended in San Antonio, Texas.

94.     It was also inappropriate and a conflict of interest for McNeese to request a forensic psychiatric evaluation of one her students from Dr. Arambula, with whom she had a previous working relationship on the Texas Medical Board.

95.     On May 14, 2020, Dixon received a request from Plaintiff's advisor to share Dr. Glass's psychiatric evaluation with the Student Affairs Office. On information and belief, not only did Dixon withhold Dr. Glass's evaluation from the Deans Office, but also from the Committee for consideration in the disciplinary process, thus creating significant prejudice against Plaintiff.

96.     On May 18, 2020, after Plaintiff's advisor raised concerns regarding Dr. Arambula's potential bias, Dixon claimed that Dr. Arambula did not know Roe's family. However, on May 20, 2020, she stated that another provider would be found to perform the psychiatric evaluation.

97.     After that, Plaintiff did not hear from the Committee for nearly three weeks. On June 8, 2020, Plaintiff emailed McNeese asking for an update on the investigation.

98.     McNeese responded on June 9, 2020 with no explanation for the delay, stating that Price, Proctor, and Associates had been appointed to perform a full-scale psychometric evaluation.

99.     On June 10, 2020, Roe texted Plaintiff trying to coordinate a location to meet up and exchange belongings. Again, Roe was evidently not fearful of Plaintiff as she had claimed.

100.    When Plaintiff did not respond to Roe's text, Roe's mother contacted Plaintiff and Plaintiff's father about exchanging belongings. Roe and Roe's mother met Plaintiff's father at his workplace where they exchanged belongings. Roe texted Plaintiff *again*, stating that she could not find Plaintiff's jacket, but she would let Plaintiff know if she found it, in an attempt to inappropriately keep the line of the communication open with Plaintiff.

101.    On June 12, 2020, Plaintiff emailed Price requesting a psychological evaluation as mandated by the University. Price responded on June 14, 2020, to schedule the appointment.

102.    On June 20, 2020, Plaintiff took USMLE STEP 2 CK in an attempt to remain on schedule at school despite his suspension. He did this without completing two of the most critical clinical rotations tested on the exam: medicine and pediatrics. Despite this, he scored at the 95th percentile.

103.    On June 22, 2020, Plaintiff underwent the psychological evaluation with Price. Price sent the evaluation to McNeese and Student Affairs on June 28, 2020.

104.    On July 7, 2020, Plaintiff emailed McNeese requesting the psychological evaluation report which had been sent to the school. However, McNeese refused to allow Plaintiff to review the report. Indeed, McNeese's assistant responded to Plaintiff, stating that the school first was planning a call with Price to "get clarification on a few questions."

105.    On July 13, 2020, Plaintiff's advisor emailed Dixon, again requesting the psychological evaluation report and updates on the investigation. Dixon responded the next day, stating that she was out of the office, but would follow up with the school.

106.    On July 18, 2020 Plaintiff emailed McNeese, *again* requesting Price's report. Yet again, McNeese refused to turn the report over. Instead, McNeese stated that the Title IX summary of events was sent to Price, and that she would notify Plaintiff once they heard from Price.

107.    On July 24, 2020 Plaintiff's advisor emailed and called Price regarding Plaintiff's psychological evaluation. Price sent the report to Plaintiff's advisor on July 29, 2020. In this evaluation, Price found that Plaintiff did not have a mental or personality disorder, but recommended continuing psychotherapy for Plaintiff. Moreover, Price determined that Plaintiff was a passive pleaser that avoided conflict, directly refuting Roe's false claims of aggression. In addition, these findings mirrored Dr. Glass's report performed months earlier, rendering the second psychological evaluation by Price an unnecessary use of time and financial resources for Plaintiff and his family.

108.    Price explained that there was a delay because the University requested that he look over additional Title IX records, which resulted in no change to the report. On information and belief, the University requested that Price view the Title IX records in order to improperly sway him to include information on the report that would be harmful to Plaintiff in the Title IX process, due to the fact that the first report clearly refuted the violent and dangerous allegations against Plaintiff.

109.    On July 30, 2020, Plaintiff once again reached out to McNeese to follow up regarding the status of Price's report. McNeese stated that she would be reaching out "soon" with

further steps. Notably, although Plaintiff had independently obtained the report from Price, McNeese *still had not released the report to Plaintiff*.

### F. Plaintiff Returns to Class, but is Denied Crucial Career Accommodations

110.    On August 5, 2020, nearly *six months* from the start of the investigation, Student Affairs sent Plaintiff a determination letter which stated that Plaintiff could have a "conditional return" on August 10, 2020, so long as he (i) engaged in continuous psychotherapy with a psychotherapist selected by the University until the psychotherapist says it is no longer needed; (ii) sign a consent form to allow the University to speak with the psychotherapist regarding Plaintiff's progress; and (iii) ensure that quarterly reports of the psychotherapy sessions were sent to Student Affairs. Clearly, the mental health related conditions indicated that this was a mental health event, rather than an incident of dating violence. The letter stated that signing the agreement would "indicate [Plaintiff's] agreement with these terms for [his] conditional return." Notably, *the letter did not contain a statement that signing the agreement admitted guilt, nor did it waive Plaintiff's right to a hearing*. Plaintiff signed the agreement and was eager to begin classes again.

111.    On August 10, 2020, Plaintiff returned to classes. Significantly, Student Affairs coordinated Plaintiff's return with *just* enough time to complete his last two third-year rotations and satisfy his fourth-year requirements.

112.    On information and belief, the University did this intentionally in order to minimize Plaintiff's time on campus. While Plaintiff was able to satisfy his third-year rotations and fourth-year requirements, his ability to apply to residency for 2020 was significantly impacted, thus forcing Plaintiff to defer one year[8].

---

[8] Plaintiff completed his third-year coursework and began his fourth year on October 19, 2020. Residency applications were due on October 20, 2020 at 11:59pm. Fourth year rotations are necessary to acquire letters of recommendation from physicians in a student's specialty of choice to support their application. Plaintiff

113.     On August 14, 2020, Plaintiff had his first meeting with McNeese and Dana McDowelle ("McDowelle") of the Student Affairs Office over Webex to discuss Plaintiff's first week back. At this meeting, McNeese and McDowelle made mention for the first time that there would be a notation of the finding of responsibility on Plaintiff's MSPE. However, the August 5 agreement that Plaintiff signed made *no mention of a notation on his records*. The University proposed the following language to be included on Plaintiff's MSPE and thus disclosed to any residency program to which Plaintiff applied:

> In the spring of 2020, [Plaintiff] had an altercation with another medical student in which his behavior/conduct was unprofessional and that involved a firearm. This event resulted in a Title IX investigation and his temporary suspension. He was found in violation of Policy 59 of the UT Health Handbook of Operating Procedures (HOOP). [Plaintiff] agreed to seek and engage in ongoing therapy and was permitted to resume his medical education.

114.     Incredibly, at this meeting, McNeese stated that Plaintiff should reach out to the chairman of orthopedics at UT Health because he would empathize with Plaintiff because they "*both have problems with women*." McNeese and McDowelle then proceeded to gossip in front of Plaintiff about men that might "understand [Plaintiff's] dilemma" with women for an extensive period of time.

115.     Moreover, McNeese mockingly asked Plaintiff how the food in jail was and asked for intimate details regarding Plaintiff's arrest and experience in jail, in spite of the fact that it had no relation to the purpose of the meeting and was wholly inappropriate. McNeese mocked Plaintiff regarding a traumatizing arrest at a time when he was deeply depressed and grieving the end of a

---

was not allowed ample time to demonstrate his clinical abilities and build relationships with these faculty before the deadline. Notably, letters of recommendation are one of the most important aspects of a student's residency application, especially in competitive fields such as Orthopedics. In comparison, Plaintiff's classmates had 114 days to participate in clinicals and obtain letters of recommendation, beginning June 29, 2020.

relationship. Incredibly, when McDowelle attempted to interject on McNeese's inappropriate behavior, McNeese merely stated "I don't care what I say anymore."

116.    McDowelle acknowledged that the University's delay in the investigation rendered it nearly impossible for him to apply to an orthopedics residency program, stating that Plaintiff would be at a severe "disadvantage" and would be better off applying to a less competitive program.

117.    In closing this meeting, McNeese threatened Plaintiff by stating "Or you're going to be getting a lot of sandwiches from us" in reference to her repeated questions about the food Plaintiff had eaten in jail. McNeese followed this threat by continuing to mock Plaintiff, "What about spam, did you get any spam? I wouldn't mind just a list of the different varieties just FYI, you know peanut butter and jelly, turkey. I can hardly wait" in a continuance of her sandwich questioning.

118.    On August 14, 2020, Plaintiff followed up on the meeting in an email to McNeese and McDowelle detailing his completed tasks and asking to be advised as to the next steps. However, Plaintiff received no response from McNeese or McDowelle.

119.    Plaintiff then began his required psychotherapy with Dr. Ross, the University-chosen psychotherapist on August 17, 2020.

120.    Also on August 17, 2020, Plaintiff emailed Dr. Warth, a research coordinator in the orthopedics department, to follow up on a research project that Plaintiff worked on with Warth prior to the allegations against him. On this particular project, Plaintiff was the lead medical student and templated knee MRIs for over sixty hours. However, Warth never responded to Plaintiff. Notably, Warth also conducts research with Roe on separate projects. On information and

belief, Roe spread rumors about the allegations on campus, which found their way back to Warth, thereby tainting Plaintiff's reputation and impacting his ability to contribute to research projects.

121.    Ten days later, on August 27, 2020, Plaintiff sent Warth another email following up on his prior email. Warth responded on August 28, 2020, merely stating that he did not have anything for Plaintiff to work on.

122.    Similarly, it became apparent that Roe had spread rumors about Plaintiff as he began noticing that many of his classmates avoided eye contact or any form of interaction with him despite being close friends prior to Roe's allegations.

123.    McDowelle had even acknowledged Roe's smear campaign when she said UT is a "small school and people talk." Despite making Plaintiff promise to maintain confidentiality, the University enabled Roe's rumors and defamation of Plaintiff by allowing her to speak freely without repercussion, which was a lapse in their personal responsibility to protect both parties and keep this matter confidential. The University took no action against Roe for her failure to maintain confidentiality.

124.    On September 9, 2020, Plaintiff received an email from Student Affairs, prompting Plaintiff for information regarding his residency without offering Plaintiff any advisory meetings to help guide him, as other medical students receive.

125.    On September 24, 2020, Plaintiff emailed McNeese and McDowelle asking (i) when the first quarterly report from Dr. Ross was due; (ii) if he would receive credit for work completed during the suspension period; (iii) if the University could help him with his fourth year and residency scheduling; and (iv) where he should go for pediatrics on September 28, 2020.

126.    Instead of McNeese or McDowelle responding, Plaintiff received a response from Defendant Lahoti on September 25, 2020 with answers to some of his questions. Plaintiff

responded on October 5, 2020, following up with additional questions. However, to this day Dr. Lahoti has never responded to Plaintiff's email.

127.    On September 26, 2020, Plaintiff received a proposed order for expunction on the criminal matter against him. This expunction would essentially make the arrest and any documents relating to the criminal charges against Plaintiff disappear. Notably, while the State determined that there was not enough evidence to even keep the records of Plaintiff's arrest, the University proceeded forward to hold Plaintiff responsible and ensure that the finding would impact his career moving forward.

128.    On October 9, 2020, Plaintiff had a meeting with Lahoti and McDowelle regarding residency. Throughout the meeting, Lahoti was extremely disrespectful and unprofessional.

129.    At the beginning of the meeting, Lahoti looked at Plaintiff's beard and stated, "that's a new look, you're going to have to shave that for interviews."

130.    Lahoti did not prepare or look at Plaintiff's academic record prior to this career planning meeting and stated "I don't remember you being at the top of your class, you had multiple high pass and pass grades if I remember correctly." On information and belief, this comment was made with the intent to provoke or anger Plaintiff by intentionally demeaning his strong academic record.

131.    Moreover, when Plaintiff mentioned the possibility of getting an expunction, Lahoti incredibly responded, "I can't imagine that would happen any time soon" and "make sure you have the expunction in hand if you do not mention your arrest to the Texas Medical Board."

132.    Plaintiff also spoke about possibly deferring for the year and joining the class of 2022, which would allow Plaintiff to participate in away rotations. However, Lahoti refused to

allow Plaintiff to defer, and was set on having Plaintiff graduate as soon as possible, even if it was not in his best interest.

133.    Moreover, Lahoti told Plaintiff that he would not be included in consideration for the Alpha Omega Alpha ("AOA") Honors Society[9] despite Plaintiff's outstanding academic record, due to the fact that a more "holistic" approach would be used for selection, which would exclude Plaintiff for the professionalism notation on Plaintiff's MSPE. Based upon grades reported by other students in Plaintiff's class who received this honor, he had equally or even more impressive grades and USMLE STEP 1 and 2 scores. This also accounts for the holistic approach Lahoti mentioned as Plaintiff has a passion for extracurricular research and has been named in 14 peer-reviewed publications in various medical journals, which is more than most resident physicians have at the end of their training.

134.    Moreover, Plaintiff was not even eligible for consideration as he was not in fourth year standing, due to the University's unreasonably prolonged investigation because when Plaintiff was invited to return on August 5, 2020, Plaintiff was a student in third year standing. When Plaintiff asked if he could defer his graduation until July 2021 to be considered for the AOA Honors Society before graduation, Lahoti threatened, "you do not want your situation to be known by a committee of 150 doctors."

135.    Lahoti also discouraged Plaintiff from pursuing orthopedics and instead insisted that Plaintiff apply to general surgery. On information and belief, this was because Roe is also a medical student pursuing orthopedic surgery.

136.    On October 9, 2020, Plaintiff had a psychotherapy session with Dr. Ross. Dr. Ross stated that she had an "uncomfortable meeting" with McNeese and McDowelle in which they

---

[9] The AOA Honors Society is awarded to the top 30 students in the class and is pivotal to matching into a competitive residency as it is heavily considered in the admissions process.

classified the situation as an attempted "murder suicide" and stated that they did not think that Plaintiff had taken responsibility for his actions. However, this was in direct contradiction with the reports from both Dr. Ross and Price, which stated that Plaintiff was a "passive pleaser" and "internalized conflict," and made no mention of aggression or homicidal intentions.

137.     On October 14, 2020, Plaintiff had a meeting with Nicole Dubuque ("Dubuque") of the Student Affairs Office to coordinate fourth year scheduling. While discussing residency options, Dubuque stated that the Deans did not allow Plaintiff to defer his fourth year of medical school *because they could not have Roe and Plaintiff in the same graduating class*. Thus, Plaintiff was denied numerous academic and residency opportunities as a result of the University's far-reaching actions to protect Roe as the female complainant. For example, Dubuque stated that Plaintiff could not continue his participation in the Academic Career Focus Tract because Plaintiff did not have enough electives available to perform three months of research despite meeting all other requirements.

138.     On October 23, 2020, Roe opted to take voluntary orthopedic trauma call while Plaintiff was performing his required fourth year rotation on that service and attempted to talk to Plaintiff by prompting him with, "did you say something?" while Plaintiff walked by her. Notably, the terms of Plaintiff's return agreement mandated that Plaintiff did not rotate onto any service that Roe was on.

139.     Following this incident, Plaintiff sent an email to the Dean of Student Affairs detailing Roe's visit and attempt to provoke Plaintiff. However, the University completely ignored Plaintiff's complaint and took no action against Roe. It is noteworthy that McNeese in their August 14, 2020, meeting, stated that she had informed Roe to "stay away" from Plaintiff in a letter provided to her.

140.     Roe continued to attempt to provoke Plaintiff with no consequences, as on October 24, 2020, Roe was present at Plaintiff's morning checkout, and she attempted to engage with Plaintiff in conversations regarding the types of fractures she encountered during the overnight call.

141.     On October 25, 2020, Plaintiff sent an email to the Deans Office following up on his prior email from October 23, 2020 and detailed Roe's further violations from October 24, 2020. McDowelle responded to Plaintiff's email by merely confirming receipt of the email. However, no action was taken against Roe.

142.     On October 27, 2020, the Final Expunction Order was signed by the court, wiping away any records of Plaintiff's arrest or charges related to the alleged incident.

### G. Despite Receiving an Expunction, the University Marks Plaintiff's MSPE and Forever Marrs Plaintiff's Ability to Obtain Employment

143.     Plaintiff was scheduled to have his MSPE meeting with McNeese and McDowelle on October 29, 2020. At 8:00 p.m. on October 28, 2020, McDowelle asked Plaintiff to sign an agreement regarding Plaintiff's understanding of the rules governing the MSPE notation while Plaintiff was on night call for his orthopedic rotation and therefore did not have ample time to review the agreement.

144.     Plaintiff's advisor emailed Meredith Mills ("Mills"), the University's Senior Legal Officer, regarding McDowelle's actions and stated that Plaintiff would not sign the agreement. Plaintiff's advisor also brought up the fact that the University had not taken action on Roe's violation of the no contact order. Incredibly, Mills stated that *she had not been informed of Roe's visit to Plaintiff's rotation*.

145.     Subsequently, the MSPE meeting was rescheduled for December by the Student Affairs secretary.

146.     On November 7, 2020, Plaintiff's advisor informed Mills of the Final Expunction Order and insisted that the Order should impact what information the school can use and share regarding the alleged incident and finding of responsibility as the University's investigation used and relied on court records that were now expunged.

147.     Plaintiff and his advisor did not receive a response to the notification of expungement until November 24, 2020, when Dixon stated that the University would redact all documents in the Title IX Office containing reference to his arrest and advise Student Affairs that they must not make mention of the arrest or criminal charges in the MSPE. However, the notation's mentioning the presence of a "firearm" in the setting of an altercation with a student alludes to a criminal action. As such, the addition of this information forces Plaintiff to possibly disclose details of his prior arrest in order to explain the notation, which would be a violation of the expungement order.

148.     On December 22, 2020, Plaintiff had his MSPE meeting with McNeese and McDowelle. Plaintiff was informed that McNeese would be contacted off-record by residency programs interested in him to inquire about this MSPE notation, despite McNeese's flagrant past demonstrations of bias against Plaintiff.

149.     In that meeting, McNeese stated that Plaintiff had in fact been deemed *not* responsible for a Title IX violation by the University when she expressly stated: "As you know, you were exonerated with the Title IX…" She then attempted to backtrack on her statement, indicating: "They didn't exonerate you, but they brought it over to the medical school. That, to tell you the truth, was the best thing that could have happened to you."

150.    McNeese further stated that it was in Plaintiff's best interest that a hearing wasn't performed during the investigation and that Plaintiff "wouldn't have wanted that."

151.    McNeese also made it clear she did not know if Plaintiff had applied to residency despite applications having been due on October 20, 2020 when she stated "Hey [Plaintiff], are you going through the match this year or next year?" Clearly, McNeese had indifference and disregard for Plaintiff's career though she is required by her position as Dean to be actively involved in students' career development.

152.    McNeese further continued to assert that Plaintiff had not taken responsibility or accountability for his actions and that Plaintiff should "get on his knees" to beg schools to take Plaintiff out of remorse, when describing the alleged incident in connection to Plaintiff's application the following year.

153.    Due to the University's improper and biased actions, Plaintiff has been left without redress and will be forced to disclose the MSPE notation throughout the residency process, which will severely limit his match opportunities. Accordingly, Plaintiff brings this action seeking monetary and injunctive relief.

## II. **Agreements, Representations, Covenants and Warranties Between Plaintiff and UT Health**

154.    Upon Plaintiff's acceptance to UT Health, the University provided him with, *inter alia*, a copy of (1) the Handbook of Operating Procedures, Student Conduct and Discipline, Policy Number 186 ("HOOP 186") which contains UT Health's various policies on general student conduct, discipline, and students' rights and responsibilities, (2) the Handbook of Operating Procedures, Sexual Misconduct, Policy Number 59 ("HOOP 59") which sets forth prohibited actions and definitions, and the process for investigating and adjudicating sexual misconduct

33

claims, and (3) the Nondiscrimination, Anti-Harassment and Equal Opportunity Policy ("Policy 183").

155.    Title IX Coordinator McNeese and Deputy Title IX Coordinator Moylan are responsible for oversight of UT Health's Title IX compliance.

156.    HOOP 186, HOOP 59 and Policy 183 (collectively referred to herein as the "Policies") comprise express and implied promises from UT Health to its students, including Plaintiff, with regard to how it will address and adjudicate complaints of sexual misconduct.

157.    Throughout the investigation and adjudication of the Title IX complaint involving Plaintiff, UT Health breached its obligations and promises under the Policies.

158.    Policy 183 provides that UT Health is "committed to providing a working and learning environment free from discrimination and harassment. The University prohibits discrimination and/or harassment by any member of the university community on the basis of race, color, religion, sex, sexual orientation, national origin, age, disability, genetic information, gender identity or expression, veteran status or any other basis prohibited by law."

159.    The University breached Policy 183 when it discriminated against Plaintiff on the basis of sex, presuming him guilty from the outset of the investigation as a male accused. As a result of the University's discriminatory investigation, Plaintiff was wrongfully found responsible for violation of the University's policies.

160.    In determining whether a policy violation occurred, UT Health utilizes the preponderance of the evidence standard. "This standard is satisfied if the action is deemed more likely to have occurred than not based on the greater weight of the credible evidence."

161.    The University breached this provision when a determination was made against the clear weight of evidence. The University ignored clear credibility concerns in Roe's shifting stories

34

and discredited the surplus of documentation that Plaintiff was able to provide to support his side of the story. Nevertheless, the University forged ahead without properly considering all of the available evidence in order to find Plaintiff responsible.

162.    According to HOOP 186, "In any case, *except in a case involving sexual misconduct as defined in HOOP 59*, where the accused student elects both not to dispute the facts upon which the charges are based and agrees to the disciplinary actions the Dean assesses, the student may execute a written waiver of the hearing procedures described in Appendix B. This administrative disposition shall be final and there shall be no subsequent proceedings regarding the charges." (emphasis added).

163.    Regarding Sexual Misconduct cases, Hoop 186 states that "In any case involving sexual misconduct as defined in HOOP 59, both the complaining witness/complainant and the accused student must agree to the terms of any administrative disposition or waiver of the hearing procedures; otherwise, the hearing and appeals will proceed in accordance with this policy."

164.    The University breached this provision when it failed to provide Plaintiff with a hearing despite the fact that Plaintiff *never signed a hearing waiver*. McNeese requested that Plaintiff signed a waiver, but Plaintiff refused and explicitly requested a hearing for his suspension. Additionally, the agreement that Plaintiff signed to go back to classes did not in any way state that a signing of the agreement constituted a waiver of the right to a hearing.

165.    According to the Policies, the respondent "shall be provided notice of the complaint and a summary of the allegations and allowed 7 business days to respond in writing." While the complainant may obtain a summary of the respondent's written response, HOOP 59 does not provide the same right to the respondent.

166.     The University breached this provision because Plaintiff was never provided with an opportunity to respond to the allegations in writing and instead proceeded directly to the interview process.

167.     HOOP 59 provides that "[a]ny person who knowingly and intentionally interferes with an ongoing investigation under this policy will be subject to disciplinary action, up to and including termination or dismissal."

168.     The University breached this provision when Roe was not disciplined despite the fact that she had repeatedly attempted to intentionally interfere with the investigation by providing false statements to paint Plaintiff as an abusive, aggressive, drug abuser, attempting to provoke Plaintiff into contacting Roe despite University and court mandated no-contact orders, and trying to provoke Plaintiff by voluntarily participating in Plaintiff's required rotations.

169.     According to the Policies, the accused student is to be provided at least ten (10) days' notice of the date, time, and place for the hearing, the name of the hearing officer, a written statement of the allegations including identity of the complainant, and a summary statement of the evidence supporting such allegations.

170.     The University breached this provision because there was never a hearing provided to Plaintiff.

171.     Each party has the right to appear, present testimony of witnesses and documentary evidence, cross-examine witnesses, and be advised by counsel.

172.     The University breached this provision because Plaintiff was not given the opportunity to appear, present testimony of witnesses, or cross-examine witnesses as he was not given a hearing. Due to the he-said-she-said nature of the allegations against Plaintiff, credibility

determinations were essential, and thus the cross-examination of witnesses was a critical portion of the determination process that Plaintiff was denied.

173.     Within ten (10) calendar days of the conclusion of the hearing, the hearing officer will send to the Dean, the complainant, and the respondent, a written decision containing findings of fact, a conclusion of whether the accused student committed one or more policy violations, and any disciplinary actions imposed.

174.     The University breached this provision because the determination of responsibility was not made by a hearing officer. Rather, the Associate Vice President of Diversity and Equal Opportunity sent Plaintiff a notice, without a hearing, that he had been found responsible for a violation of HOOP 59.

175.     HOOP 186 provides that "Either the Dean or the student may appeal the decision of the hearing officer." Moreover, "In any case involving sexual misconduct as defined in HOOP 59, both the complaining witness/complainant and the accused student must agree to the terms of any administrative disposition or waiver of the hearing procedures; otherwise, the hearing and appeals will proceed in accordance with this policy."

176.     The University breached this provision by depriving Plaintiff of his right to appeal despite the fact that he never signed a hearing waiver. The University issued a finding without a hearing, and as such, did not give Plaintiff an opportunity to appeal the decision.

177.     HOOP 59 guarantees that "[b]oth parties will receive equal opportunities in all aspects of the process including notices and advisor representation." The University violated this provision by not affording Plaintiff the same opportunities and support services as Roe. While Roe, as the complainant, was protected at all costs, Plaintiff, who was subject to an abusive relationship and suffering the mental health ramifications therefrom, was offered no supportive services and

lost his student health insurance because of his prolonged interim suspension, in a direct contradiction to UT Health's "Wellness and Resilience" program that is advertised to prospective students promising support services and promoting health and wellness to students during their stressful educational experience by, among other things, "offer[ing] a holistic suite of resources: academic, physical, mental, professional, financial, diversity, and service."

### III.   Plaintiff's Damages

178.    As a direct and proximate result of Defendants' biased, illegal and improper conduct, an erroneous finding that Plaintiff engaged in dating violence has been made a part of Plaintiff's MSPE, which is required to be released to medical institutions in order to be considered for a residency match. The notation merely states that Plaintiff violated HOOP 59, which is the University's Sexual Misconduct Policy. A notation denoting sexual misconduct improperly brands Plaintiff as a sex offender, thereby substantially limiting Plaintiff's ability to match with a competitive residency program of his choice. The notation paints Plaintiff as a dangerous sex-criminal with a firearm, wiping out a lifetime of hard work towards his medical school education and future career prospects.

179.    By improperly suspending Plaintiff for *six months* and placing a notation on Plaintiff's MSPE denoting the suspension and finding, UT Health has damaged Plaintiff's future education and career prospects. Specifically, as a result of UT Health's actions, Plaintiff will be forced to disclose and explain to potential employers to which he may opt to apply that he was disciplined by UT Health for sexual misconduct.

180.    In the wake of the #MeToo movement, residency programs and employers will not be clamoring to hire someone who has been found responsible for sexual misconduct.

181.    Due to Defendants' biased, illegal and improper conduct, Plaintiff was subject to an unfair, biased, improper investigation and adjudication process which destroyed his reputation and will permanently impact his future education and career prospects.

182.    Due to Defendants' biased, illegal and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

183.    Due to Defendants' biased, illegal and improper conduct, Plaintiff has been improperly labeled as a perpetrator of sexual misconduct.

184.    Due to Defendants' biased, illegal and improper conduct Plaintiff has suffered and will continue to suffer ridicule, reputational damage, economic losses, and damages to his future educational and career prospects.

<div align="center">

**AS AND FOR A FIRST CAUSE OF ACTION**
**<u>Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.</u>**
**<u>Erroneous Outcome</u>**
**(Against Defendant UT Health)**

</div>

185.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

186.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

187.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant UT Health.

188.    Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

189.    The Fifth Circuit has recognized that there are several theories available to a plaintiff alleging gender bias in violation of Title IX. One of those theories is known as the "erroneous outcome" theory.

190.    "Plaintiffs who claim that an erroneous outcome was reached must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

191.    UT Health violated Title IX in the instant case because it reached an erroneous finding of responsibility against Plaintiff, and gender bias was a motivating factor in the wrongful finding.

192.    The outcome was erroneous because, by way of example and not limitation:

a.   Plaintiff maintained at all times throughout the investigation that he never intended to harm himself or Roe;

b.   Plaintiff and Roe were broken up at the time of the alleged incident, and thus it did not constitute a "dating relationship" so as to fall under the umbrella of Title IX;

c.   The University failed to conduct a psychiatric evaluation and substance abuse test of Roe despite physician recommendations;

d.   The University failed to consider credibility concerns of Roe despite her allegations that were clearly discredited by the evidence;

e.   The University failed to treat the event as a mental health crisis rather than an instance of dating violence;

f.   The University failed to consider credibility concerns of Roe despite Dr. Glass's evaluation that Roe had a mental health issue;

g.   The University failed to provide Plaintiff with a hearing before finding Plaintiff responsible as required in HOOP 59, thus precluding Plaintiff's ability to present a defense and cross-examine witnesses;

40

     h.  McNeese informed Plaintiff during their meeting of December 22, 2020 that he had in fact been deemed *not* responsible for a Title IX violation by the University when she expressly stated: "As you know, you were exonerated with the Title IX…"

193.    Particular circumstances suggest that gender bias was a motivating factor behind the flawed proceedings, erroneous findings, and/or the decision to impose unduly harsh discipline upon Plaintiff. These circumstances include, by way of example and not limitation:

     a.  The pressure imposed by the 2014 OCR resolution, including the fear of loss of federal funds, as well as the fear of added financial liability such as reimbursing tuition for aggrieved students;

     b.  McNeese's suggestion that Plaintiff should reach out to the chairman of orthopedics at UT Health because he would empathize with Plaintiff because they "both have problems with women";

     c.  Lahoti's comments regarding Plaintiff's appearance and statements disbelieving Plaintiff's expungement;

     d.  Failing to require a psychiatric evaluation of both Plaintiff and Roe despite Dr. Glass's recommendations, and instead only requiring an assessment of Plaintiff;

     e.  Failing to discipline or warn Roe about her actions in voluntarily appearing at Plaintiff's work and provoking him, while subjecting Plaintiff to dismissal if he contacted Roe in any way.

194.    On information and belief, UT Health's mishandling of Plaintiff's Title IX case was informed by institutional, systemic gender bias, as well as external pressure from the student body and the United States Department of Education, under a threat of rescission of federal funds.

195.    UT Health applied its policies and procedures in a manner that discriminated against Plaintiff on the basis of his sex and led to an erroneous outcome.

196.    UT Health also imposed an unwarranted and unjustly severe sanction on Plaintiff, and gender bias was a motivating factor, for the same reasons as described above.

197.     Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual misconduct and to punish him severely for it.

198.     This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

199.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UT Health to: (i) reverse the outcome, findings, and sanction regarding the complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe complaint; (iii) remove any record of the finding or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) remove the professionalism notation on Plaintiff's MSPE regarding the Roe complaint; and (v) any and all further actions required to return Plaintiff to the status quo ante.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.**
**Selective Enforcement**
**(Against Defendant UT Health)**

200.     Plaintiff John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

201.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

202.     Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant UT Health.

203.     Title IX is enforceable through a private right of action.

204.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018).

205.     The "prompt and equitable" procedures that a school must implement include, at a minimum: "Notice . . . of the procedure, including where complaints may be filed; Application of the procedure to complaints alleging harassment . . .; Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; Designated and reasonably prompt timeframes for the major stages of the complaint process; Notice to the parties of the outcome of the complaint; and [a]n assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects . . . ." Dep't of Ed., Office for Civ. Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20.

206.     According to the 2001 Guidance, schools are obligated under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'" *Id.* at 21.

207.     To succeed on a selective enforcement claim, a plaintiff must demonstrate that gender was a motivating factor in the decision to initiate a disciplinary action and/or the severity of the punishment. *Lozano v. Baylor Univ.*, 408 F. Supp. 3d 861, 882 (W.D. Tex. 2019)

208.    Selective enforcement occurred in this case because Plaintiff's gender was a motivating factor in both UT Health's decision to continue with an investigation even after criminal expungement and in the implementation of a sanction which would preclude Plaintiff's ability to match with a competitive residency program and thereby affect the rest of his career.

209.    UT Health selectively enforced its Policies as between similarly situated male and female students. By way of example and not limitation:

    a.   Plaintiff and Roe were similarly situated in that both students alleged actions against the other that could constitute a violation of the Policies, but UT Health prosecuted Roe's claims to the fullest, whereas UT Health blatantly ignored Plaintiff's claims. Specifically, the University failed to discipline or even issue Roe a warning for attempting to initiate contact with Plaintiff multiple times in order to interfere with the investigation and provoke Plaintiff to violate court and University mandated no-contact orders, even after Plaintiff raised the issue to the University twice. On the other hand, had Plaintiff initiated contact with Roe, Plaintiff would have been dismissed;

    b.   Despite recommendations from Dr. Glass, the University declined to request a psychiatric examination from Roe and Plaintiff in order to determine the credibility of the allegations, and instead only requested an evaluation from Plaintiff;

    c.   Roe was presumed credible from the start and Plaintiff was presumed guilty from the start.

210.    UT Health also imposed an unduly harsh sanction, which was motivated by Plaintiff's gender. As the University acknowledged, with the disciplinary notation on Plaintiff's MSPE, Plaintiff would effectively be forced to "get on his knees" and beg for acceptance to a residency program. However, in implementing a notation on Plaintiff's MSPE that would affect his career prospects for the rest of his life, the University failed to account for Plaintiff's spotless disciplinary record in his years at UT Health.

211.    Particular circumstances suggest that gender bias was a motivating factor behind UT Health's selective enforcement of the Policies. These circumstances include, by way of

example and not limitation:

     a.   The pressure imposed by the 2014 OCR resolution, including the fear of loss of federal funds, as well as the fear of added financial liability such as reimbursing tuition for aggrieved students;

     b.   McNeese's suggestion that Plaintiff should reach out to the chairman of orthopedics at UT Health because he would empathize with Plaintiff because they "both have problems with women";

     c.   Lahoti's comments regarding Plaintiff's appearance and statements disbelieving Plaintiff's expungement;

     d.   Failing to require a psychiatric evaluation of both Plaintiff and Roe despite Glass's recommendations, and instead only requiring an assessment of Plaintiff;

     e.   Failing to discipline or warn Roe about her actions in voluntarily appearing at Plaintiff's work and provoking him, while subjecting Plaintiff to dismissal if he contacted Roe in any way.

212.    On information and belief, UT Health has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct made against female/non-male students.

213.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

214.    This unlawful discrimination in violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

215.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UT Health to: (i) reverse the outcome, findings, and sanction

regarding the complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe complaint; (iii) remove any record of the finding or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) remove the professionalism notation on Plaintiff's MSPE regarding the Roe complaint; and (v) any and all further actions required to return Plaintiff to the status quo ante.

### AS AND FOR A THIRD CAUSE OF ACTION
### 42 U.S.C. §1983: Denial of Fourteenth Amendment Procedural Due Process
### (Against All Defendants)

216.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

217.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." In this case, Defendants are state actors subject to the Fourteenth Amendment.

218.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

219.    A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

220.    A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process. *See Oliver v. Univ. of Texas Sw. Med. Sch.,* No. 3:18-CV-1549-B, 2019 WL 536376, at *8 (N.D. Tex. Feb. 11, 2019) (recognizing plaintiff "has a liberty interest in his higher education, and that the harm to his reputation and inability to pursue a career as a doctor

entitles him to procedural due process protections.")

221.    Prior to his suspension, Plaintiff was an exceptional student in good standing at UT Health. Plaintiff's constitutionally protected property interest in his continued enrollment at UT Health and to be free from arbitrary dismissal arises from the policies, courses of conduct, practices and understandings established by UT Health.

222.    Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between UT Health and Plaintiff.

223.    UT Health, as a public institution established by the State of Texas, as well as the individual Defendants, as agents of the University and individually have a duty to provide students equal protection and due process of law by and through any and all policies and procedures set forth by the University.

224.    Fourteenth Amendment due process protections are required in higher educational disciplinary proceedings. At a minimum, the Supreme Court has made clear that there are two basic due process requirements: (1) notice, and (2) an opportunity to be heard. *Papin v. Univ. of Miss. Med. Ctr.*, 347 F.Supp.3d 274, 279 (S.D. Miss. Sept. 28, 2018) citing *Flaim v. Med. Coll. Of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005).

225.    Where a student at a public university faces suspension or expulsion through a disciplinary proceeding, a serious property interest is at stake; a suspension or expulsion will have a lasting negative impact on the student's life, so heightened due process protections including a hearing, with the right to present evidence, cross-examine adversarial witnesses and to call witnesses may be required. *Doe v. Univ. of Mississippi*, 361 F. Supp. 3d 597, 611 (S.D. Miss. 2019); *Doe v. Baum*, 2018 WL 4265634, at **3-5 (6th Cir. Sept. 7, 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 402-04 (6th Cir. 2017).

226.     Plaintiff, as a UT Health student, faced disciplinary action that included the possibility of suspension or expulsion. Accordingly, the Due Process provisions of the Fourteenth Amendment applied to the disciplinary process utilized in Plaintiff's case.

227.     Plaintiff was entitled to a process commensurate with the seriousness of the allegations and potential discipline, sanctions, and repercussions he was facing.

228.     The allegations in this case resulted in Plaintiff's six-month suspension pending the outcome of the matter and a permanent marking on Plaintiff's MSPE that will have lifelong ramifications for Plaintiff with respect to his education, employment, and reputation.

229.     Throughout the investigation and adjudication of the professionalism charges against Plaintiff, Defendants violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through their deprivation of the minimal requirements of procedural fairness, by way of example and not limitation:

    a.   The University failed to give adequate notice of the charges and the possible sanctions, as there was no mention of a notation that would permanently mark his MSPE;

    b.   The University failed to provide an impartial investigator and decisionmaker, and instead appointed a Committee of all women that was biased against males, as evidenced by McNeese's comment that Plaintiff should reach out to the chairman of orthopedics at UT Health because he would empathize with Plaintiff because they "both have problems with women";

    c.   Plaintiff was deprived of a fair and impartial hearing. Despite Plaintiff's refusal to submit a hearing waiver and explicit request for a hearing, the University failed to provide Plaintiff with a hearing;

    d.   The University found Plaintiff responsible and marked him as a perpetrator of sexual misconduct without an adequate hearing;

    e.   Plaintiff was precluded from the opportunity to cross examine Roe and her witnesses. As this is a case that ultimately turns on the credibility of the parties, cross examination was critical;

    f.   Plaintiff was deprived of an opportunity to appeal the finding, as he was also

deprived of a hearing.

230.     Throughout the investigation, the University took Roe's statements at face-value and determined the complainant was credible, despite Plaintiff providing clear exculpatory evidence. There was no neutral, thorough, or fair administrators overseeing the process, no hearing prior to the determination, and thus no opportunity for cross-examination prior to the determination, in violation of due process of law. *Neal v. Colorado State Univ. Pueblo*, 2017 WL 633045, at *25 (D. Colo. February 16, 2017). See *Lee v. Univ. of N. Mexico*, Case No. 1:17-cv-01239-JB-LF (Sept. 20, 2018) (Doc. No. 36), at p. 3; *Doe v. Baum*, 2018 WL 4265634, at **3-5; *Doe v. Univ. of Cincinnati*, 872 F.3d at 402-04; *Norris v. Univ. of Colorado*, Boulder, 362 F. Supp. 3d 1001, 1017 (D. Colo. 2019).

231.     Defendants, as well as other agents, representatives, and employees of UT Health, acted under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

232.     Defendants all agreed to, approved, and ratified this unconstitutional conduct.

233.     As a result of these due process violations, Plaintiff continues to suffer substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

234.     McNeese, as the Title IX Coordinator and Vice Dean for Admissions and Student Affairs, is responsible in her official capacity for oversight of the disciplinary process and for ensuring UT Health's compliance with any federal court injunction concerning ongoing due process violations in a disciplinary case, including the expungement of Plaintiff's disciplinary record.

235.    For a federal court injunction ordering prospective relief in a case involving a sexual misconduct proceeding at UT Health, joinder of McNeese in her official capacity is necessary for purposes of implementation of the requested prospective relief.

236.    As a result of the foregoing, Plaintiff has standing to seek, and is entitled to, an injunction vacating Plaintiff's disciplinary finding and the decision, granting expungement of Plaintiff's academic record, clearing the notation on Plaintiff's MSPE, and enjoining future violations of due process in the process of investigating and adjudicating the sexual misconduct complaint that is the subject of this action.

237.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages including, without limitation, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

238.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UT Health to: (i) reverse the outcome, findings, and sanction regarding the complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe complaint; (iii) remove any record of the finding or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) remove the professionalism notation on Plaintiff's MSPE regarding the Roe complaint; and (v) any and all further actions required to return Plaintiff to the status quo ante.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands judgment

against Defendants as follows:

(i)    On the first cause of action for violation of Title IX of the Education Amendments of 1972: erroneous outcome, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UT Health to: (i) reverse the outcome, findings, and sanction regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the Roe finding or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) remove any notation relating to the Roe matter from Plaintiff's MSPE; and (v) any and all further actions required to return Plaintiff to the status quo ante;

(ii)    On the second cause of action for violation of Title IX of the Education Amendments of 1972: selective enforcement, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UT Health to: (i) reverse the outcome, findings, and sanction regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the Roe finding or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) remove any notation relating to the Roe matter from Plaintiff's MSPE; and (v) any and all further actions required to return Plaintiff to the status quo ante;

(iii)    On the third cause of action for a violation of 42 U.S.C. § 1983 procedural due process, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UT Health to: (i) reverse the outcome, findings, and sanction regarding Roe's complaint; (ii) expunge Plaintiff's disciplinary record with respect to the Roe matter; (iii) remove any record of the Roe finding or Plaintiff's suspension from his educational file/disciplinary records/transcript; (iv) remove any notation relating to the Roe matter from Plaintiff's MSPE; and (v) any and all further actions required to return Plaintiff to the status quo ante; and

(iv)   Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

**Dated:   New York, New York**
**April 30, 2021**

Respectfully submitted,

**NESENOFF & MILTENBERG, LLP**
***Attorneys for Plaintiff John Doe***

By:  _/s/   Andrew Miltenberg_

Andrew T. Miltenberg, Esq. (*pro hac vice pending*)
Tara J. Davis, Esq. (*pro hac vice pending*)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
tdavis@nmllplaw.com

-and-

**JORDAN, LYNCH & CANCIENNE PLLC**
**By:  _/s/  Walter Lynch_**
Walter Lynch, Esq.
*State Bar No. 24046330*
*Federal ID No. 965265*
Amir Halevy, Esq.
*State Bar No. 24065356*
*Federal ID No. 1259956*
1980 Post Oak Blvd, Suite 2300
Houston, Texas 77056
(713) 955-4021
wlynch@jlcfirm.com
ahalevy@jlcfirm.com